UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EXECUTIVE JET, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AIRTRAN AIRWAYS, INC., and )<br>ATLANTIC AVIATION FBO HOLDINGS, LLC, )<br>)<br>Defendants. ) | Case No. 3:10-cv-00710<br>Judge Trauger |

**MEMORANDUM**

Pending before the court is Defendant AirTran Airways, Inc.'s Motion for Summary Judgment (Docket No. 63), to which the plaintiff has filed a response (Docket No. 70). Also before the court is Defendant Atlantic Aviation FBO Holdings, LLC's Motion for Summary Judgment (Docket No. 67), to which the plaintiff has filed a response (Docket No. 71), and to which the defendant has filed a reply (Docket No. 74). For the reasons discussed herein, both motions will be granted.

**FACTUAL BACKGROUND**

This tort action arises out of an incident at the Nashville International Airport ("the airport") on July 6, 2008. The plaintiff, Executive Jet, LLC ("Executive Jet"), is the owner and operator of a Mitsubishi MU-300 ("MU-300") aircraft that was towed and parked that day by the defendant, Atlantic Aviation FBO Holdings, LLC ("Atlantic") on a general aviation ramp at the

1

airport.[1] According to the plaintiff, the MU-300 sustained damage to its windshield and left jet engine later that day from the jet blast of a Boeing 737 aircraft ("737") operated by the defendant, AirTran Airways, Inc. ("AirTran"), while it was being directed to a taxiway by Atlantic's line crew.

The plaintiff's theory of the case was probed at the February 6, 2013 deposition of its corporate designee, Mark Myers. Myers testified that pilots Scott House and Scott Pooree flew the MU-300 to Nashville on Sunday, July 6, 2008, in advance of maintenance work to be performed by an entity called Stevens Aviation beginning the following morning.[2] House and Pooree provided Myers with information regarding the relative positions of the MU-300 and the 737 that day. Myers testified that he was informed by House and Pooree that, after landing, the MU-300 was initially parked at the southern end of the general aviation ramp in front of Atlantic's fixed base operating facility. Shortly thereafter, Atlantic's employees moved the MU-300 north to a location on the ramp that was in front of Stevens Aviation's facility, which was closed at the time. The MU-300 was parked so that its front end was facing in a northerly direction. According to Devin Lawrence, the General Manager of Atlantic's facility at the airport, when customers of Stevens Aviation landed their aircraft at Atlantic's facility during times when Stevens Aviation's maintenance and repair facility was closed, it was and continues

---

[1] Unless otherwise noted, the facts are drawn from the defendant AirTran Airways, Inc's statement of undisputed material facts (Docket No. 65), the plaintiff's responses thereto (Docket No. 70), and related exhibits. They are also drawn from the defendant Atlantic Aviation FBO Holdings, LLC's statement of undisputed material facts (Docket No. 69), the plaintiff's responses thereto (Docket No. 72), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

[2] Stevens was specifically going to perform maintenance on the right engine of the MU-300.

to be Atlantic's ordinary business practice to tow and park the customers' aircraft to a location in front of Stevens Aviation's facility. (Docket No. 74-1 ¶ 2.) Lawrence noted that there is no written agreement with Stevens Aviation or the plaintiff for this practice and that it was not compensated by either party for towing and parking the MU-300 on July 6, 2008. (*Id.* ¶¶ 3-4, 7.)

House and Pooree informed Myers that the 737 was parked to the north of the MU-300 and that its front end was facing somewhere between a southerly and westerly direction. Both of these individuals departed the airport shortly after the MU-300 was moved from its initial location to the site in front of the Stevens Aviation facility and before the aircraft sustained any damage.

Myers testified that he received a telephone call the next morning (July 7, 2008) from an employee of Stevens Aviation informing him that the MU-300 had sustained damage to its windshield. Approximately 15 to 20 minutes later, Myers received a second call from a Stevens Aviation employee informing him that there were foreign objects within the left engine of the MU-300. During a third call with a Stevens Aviation employee that took place later that day, Myers was informed that someone on Atlantic's line crew had told him (the Stevens Aviation employee) that gravel had been blown into the windshield and left engine while they were directing the departure of a 737 aircraft from the ramp at approximately 6:00 or 6:30 on the evening of July 6, 2008. Myers has no personal knowledge that the 737 was an AirTran aircraft. He testified that he deduced this conclusion after examining a "FlightAware database"[3] and

---

[3] FlightAware is a commercial website that, among other things, provides live flight tracking, pilot resources, and a discussion forum. *See* http://flightaware.com (last visited May 21, 2013).

determining that an AirTran 737 departed from the airport at approximately 6:00 p.m. on July 6, 2008.

Myers also testified that another Executive Jet employee, Lon Pepple, spoke to a manager at Atlantic about the incident within a few days of its occurrence.[4] Pepple passed away in June 2010. While Myers testified that Pepple reported that he spoke with an Atlantic manager, Myers was unable to identify that manager by name. According to Myers, Pepple was told by the Atlantic manager that the other aircraft involved in the July 6, 2008 incident was an AirTran 737 and that the linemen had "'been out there directing and observed the damage on the [MU-300].'" According to the information provided by the linemen to the Atlantic manager, and then by the Atlantic manager to Pepple, and ultimately by Pepple to Myers, the linemen observed that debris was blown into the MU-300 by the AirTran 737.

During his deposition, Myers provided testimony concerning the condition of the ramp's asphalt surface. He stated that he had visited the scene of the incident during the July 2008 time period and that, while he believed the asphalt surface was aging, he observed no evidence of crumbled asphalt, gravel, or other debris in the area. He added that, although he did not know who was responsible for the ramp's maintenance, its surface was nevertheless reasonably maintained.

The plaintiff's theory, as articulated by Myers at his deposition, is that the parked 737 that House and Pooree previously observed was directed out of the ramp area by Atlantic linemen, initially moving southbound toward the parked MU-300 before making a right turn and

---

[4] Both AirTran and Atlantic mistakenly assert in their statement of undisputed facts that Pepple spoke with a manager employed by Stevens Aviation. The cited portions of Myers' deposition make clear that Pepple's conversation was, in fact, with an Atlantic manager.

proceeding westbound toward a taxiway.  After making this right turn, the 737 (which, at this time, would have been perpendicular to the parked MU-300) increased the thrust of whichever engine was in use as it was taxiing, throwing debris into the windshield and left engine of the parked MU-300.  Myers believed that the parked 737 that House and Pooree observed before departing the airport had to be the same aircraft that caused the damage to the MU-300 because: (1) the pilots only reported one 737 parked in the vicinity of the MU-300; (2) a Stevens Aviation employee informed him that there was a 737 parked in the vicinity; and (3) he had never seen a 737 parked on the ramp.  While he accessed the FlightAware database to learn that an AirTran 737 departed the airport at 6:00 p.m. on July 6, 2008, Myers could not definitively state that this departing aircraft was the same 737 that was previously observed by House and Pooree.

Although the MU-300 sustained damage to its windshield and left engine, the left side of the aircraft's fuselage was unharmed.  Myers acknowledged that he was puzzled by this fact.  He stated that he was unable to locate any scratches to the paint or windows of the left side of the fuselage.

On March 15, 2013, the defendants served the plaintiff with their Consolidated Rule 26 Disclosure of Expert, Robert J. Butler, Ph.D., P.E.  The disclosure attached Dr. Butler's expert report, wherein he disagreed with the aforementioned theory expressed by Myers and opined that the damage to the plaintiff's MU-300 "was more likely produced by an aircraft generating thrust more parallel to the left side of the MU-300's fuselage."  Dr. Butler further opined that the damage sustained to the MU-300 is not consistent with the theoretical path of the 737 advanced by Myers at his deposition.  The plaintiff has not controverted the opinions expressed by Dr. Butler in his expert repot by serving its own expert disclosure or otherwise.

5

The plaintiff commenced this action on July 6, 2010 in the Circuit Court for Davidson County, alleging state law claims against AirTran for negligence, negligence per se, and strict liability. (Docket No. 1-1.) AirTran subsequently removed the action to this court on July 27, 2010. It filed its Answer on August 2, 2010, and asserted comparative fault against Atlantic and the Federal Aviation Administration ("FAA"). (Docket No.1.) On June 23, 2011, the plaintiff filed an Amended Complaint adding Atlantic, the FAA, the Metropolitan Nashville Airport Authority ("MNAA"), and Macquire Infrastructure Company, LLC ("Macquire") as defendants. (Docket No. 8 ¶¶ 4-6.) It asserted negligence claims against each of these defendants. (*Id.* ¶¶ 13-15.) On September 7, 2011, MNAA moved to dismiss the negligence claim asserted against it on statute of limitations grounds. (Docket No. 14 at 5.) In response to this motion, the plaintiff voluntarily dismissed MNAA. (Docket Nos. 31-34.) The plaintiff also voluntarily dismissed Macquire after it filed its own dispositive motion. (Docket Nos. 37-39, 41.)

The FAA has not formally appeared in this case. Instead, it raised a jurisdictional issue with the plaintiff's counsel via email. (*See* Docket No. 48, n.1.) Specifically, it noted that the plaintiff's negligence claim was not first presented to the agency and formally denied pursuant to the Federal Tort Claims Act's administrative exhaustion requirement contained in 28 U.S.C. § 2675(a). (*Id.*) Since the filing of the Amended Complaint, the docket does not reflect any action taken by the plaintiff against the FAA.

On April 1, 2013, both AirTran and Atlantic filed their respective motions for summary judgment that are now pending before the court.[5]

---

[5] Also pending before the court is Atlantic's motion to compel the plaintiff to supplement its initial disclosures and to fully respond to Atlantic's first set of interrogatories and first set of requests for production of documents. (Docket No. 62.) Atlantic does not argue that these discovery issues have any bearing on its summary judgment motion. Given the court's summary

## ANALYSIS

**I.     Standard of Review**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

---

judgment ruling today, it will deny the motion to compel as moot.

**II.     The Defendants' Motions**

Both AirTran and Atlantic argue that they are entitled to summary judgment because the plaintiff has failed to adduce any admissible evidence demonstrating that either defendant caused the damages sustained to the MU-300.  (Docket No. 64 at 6-9; Docket No. Docket No. 68 at 16.) In responding to AirTran's motion, the plaintiff stated, in a single page, that: (1) it lacked proof to negate AirTran's statement of undisputed material facts; (2) it was "unable to controvert some of the allegations made by the [d]efendants" due to Pepple's death; and (3) it lacked expert testimony to "controvert the expert opinion relied upon by" AirTran.  (Docket No. 70 at 1.)  In responding to Atlantic's motion, the plaintiff argued that the court should deny summary judgment because a reasonable jury could find Atlantic liable for negligence under a bailment theory.  (Docket No. 71 at 4.)  The court will address each of the defendant's motions in turn.

**A.     AirTran's Motion for Summary Judgment**

Again, in its Amended Complaint, the plaintiff alleges that AirTran is liable for causing damage to the MU-300 under theories of negligence, negligence per se, and strict liability. (Docket No. 8 ¶¶ 10-12, 16.)  To establish any one of these claims, a plaintiff must show that the defendant caused the underlying injury.  *See Sallee v. Barrett*, 171 S.W.3d 822, 827 (Tenn. 2005) (listing the "five elements of general negligence: duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause"); *Rains v. Bend of the River*, 124 S.W.3d 580, 590 (Tenn. Ct. App. 2003) ("Plaintiffs in negligence per se cases must still establish causation in fact, legal cause, and damages"); and *Concklin v. Holland*, 138 S.W.3d 215, 222 (Tenn. Ct. App. 2003) (noting that a strict liability claim premised on ultrahazardous activity requires proof of causation).  In its motion, AirTran assumes, for the sake of argument, that its own 737 was

parked in the vicinity of the MU-300 at the general aviation ramp and departed from the airport on the evening of July 6, 2008, as the plaintiff alleges. Nonetheless, it contends that the court should grant it summary judgment because the plaintiff has failed to adduce admissible evidence of causation. (Docket No. 64 at 6.)

As AirTran contends in its motion, the plaintiff's "jet blast" theory is predicated on information contained in inadmissible out-of-court statements relayed to Myers. Indeed, at his deposition, Myers described three telephone conversations he had with employees of Stevens Aviation on July 7, 2008. Specifically, in the third conversation, Myers testified that a Stevens Aviation employee stated that someone on Atlantic's line crew had told him (the Stevens Aviation employee) that gravel had been blown into the windshield and left engine of the MU-300 while they were directing the departure of a Boeing 737 aircraft from the ramp. The information that the Stevens Aviation employee allegedly relayed to Myers is inadmissible hearsay, as it is being offered to prove the truth of the matter asserted - namely, that a Boeing 737 caused the windshield and left engine damage to the MU-300. Myers also testified about a conversation the late Mr. Pepple had with an unidentified Atlantic manager, wherein the manager informed Pepple that Atlantic's linemen had observed debris that was blown into the MU-300 by an AirTran 737. This evidence is also hearsay, as it is being offered to prove that an AirTran 737 caused the damage to the MU-300. The plaintiff cannot rely on hearsay statements to oppose a summary judgment motion. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (noting that hearsay evidence cannot be used to counter a motion for summary judgment and must be disregarded). Because the plaintiff has failed to present any admissible evidence from which a

9

reasonable jury could find that an AirTran 737 caused the damages to the MU-300, the court will grant AirTran's motion for summary judgment.[6]

### B. Atlantic's Motion for Summary Judgment

Atlantic has similarly moved for summary judgment on the basis that the plaintiff has failed to adduce admissible evidence showing that it caused the damage sustained to the MU-300. (Docket No. 68 at 16.) In opposing Atlantic's motion, the plaintiff does not address Atlantic's assertion concerning causation, but instead argues that summary judgment should be denied because it has presented sufficient evidence to create a prima facie case of negligence by a bailee pursuant to Tenn. Code Ann. § 24-5-111. (Docket No. 71 at 4.) This statute provides that:

> In all actions by a bailor against a bailee for loss or damage to personal property, proof by the bailor that the property was delivered to the bailee in good condition and that it was not returned or redelivered according to the contract, or that it was returned or redelivered in a damaged condition, shall constitute prima facie evidence that the bailee was negligent, provided the loss or damage was not due to the inherent nature of the property bailed.

*Id.* As Atlantic points out in its reply, the operation of the aforementioned statute presumes the existence of a bailment relationship, which it contends the plaintiff neither alleged in its Amended Complaint nor established through admissible evidence. (Docket No. 74 at 3-8.)

A bailment is the "delivery of personalty for a particular purpose or on mere deposit, on a contract express or implied; that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, or otherwise dealt with according to his direction or kept until he

---

[6] The court's conclusion is reinforced by the uncontroverted opinion of Dr. Butler, the defendants' retained expert. Indeed, Dr. Butler opined that the plaintiff's "jet blast" theory is not plausible, as the damage sustained to the MU-300 is not consistent with the theoretical path of the 737 described by Myers at his deposition.

10

reclaims it." *Dispeker v. New S. Hotel Co.*, 373 S.W.2d 904, 908 (Tenn. 1963). In the absence of an express contract, the creation of a bailment "requires that possession and control over the subject matter pass from the bailor to bailee." *Rhodes v. Pioneer Parking Lot, Inc.*, 501 S.W.2d 569, 570 (Tenn. 1973). Moreover, "[i]n order to constitute a sufficient delivery of the subject matter[,] there must be a full transfer, either actual or constructive, of the property to the bailee so as to exclude it from the possession of the owner and all other persons and give to the bailee, for the time being, the sole custody and control thereof." *Id.*

Assuming for the purposes of Atlantic's motion that the Amended Complaint alleged a bailment claim, the court nonetheless finds that the plaintiff has failed to adduce sufficient evidence to allow that claim to proceed to trial. Indeed, the plaintiff's brief fails to state the elements of a bailment or otherwise demonstrate how those elements were met in the instant case. Instead, the plaintiff merely asserts, without elaboration, that it placed the MU-300 into the care and control of Atlantic, thus creating a *de-facto* bailment relationship. (Docket No. 71 at 1, 4.) However, the plaintiff's bailment theory is lacking, because it cannot establish that it made a sufficient delivery - that is, it cannot show that it transferred the MU-300 into Atlantic's sole custody and control. Indeed, the record evidence shows that the plaintiff flew the aircraft to Nashville on July 6, 2008 for the express purpose of having Stevens Aviation perform scheduled maintenance the following morning. Thus, while Atlantic towed and parked the MU-300 in front of Stevens Aviation's facility, it cannot reasonably be said that Atlantic was given the aircraft by the plaintiff so as to exclude it from the possession of all other persons. Because the plaintiff cannot demonstrate the existence of a bailment relationship between itself and Atlantic,

it cannot benefit from the statutory presumption contained in Tenn. Code Ann. § 24-5-111.

Accordingly, Atlantic's motion for summary judgment will be granted.

## **CONCLUSION**

Based on the foregoing, AirTran and Atlantic's respective Motions for Summary Judgment (Docket Nos. 63 and 67) will be **GRANTED**.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge